IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARVIN BROWN,

        Plaintiff,

v.                                                                   CIV 97-825 BB/KBM

JOE WILLIAMS, ET AL.,

        Defendant

## AMENDED PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

On March 27, 2000, I entered proposed findings recommending that Plaintiff's *in forma pauperis* status be revoked, Plaintiff be required to pay the $150 filing fee, and the Court stay consideration of the merits. *Doc. 65.* Plaintiff and Defendants objected. *Docs. 67, 68.* Having considered their arguments and being otherwise fully advised, I now also recommend that summary judgment be entered for all Defendants and that Plaintiff's complaint be dismissed with prejudice.

### I.  Plaintiff Falls Within The "Three Strikes" Provision

The discussion and findings in my previous report are incorporated herein by reference. Under the "three strikes" provision of the Prison Litigation Reform Act of 1995, prisoners who have had three or more civil actions dismissed as frivolous, malicious or for failure to state a claim cannot bring an action *in forma pauperis* unless they are under an "imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

When this case was originally filed, *in forma pauperis* status was denied on the basis of

three cases Plaintiff had previously filed. On appeal of that decision, the Tenth Circuit found that one of the cases relied upon, *Brown v. NM District Court, et al.,* CIV 96-968, could not count as a strike because it had been vacated and remanded with instructions to allow amendment. This case was remanded on August 28, 1998.

*In forma pauperis* status was reinstated on September 25, 1998, and Plaintiff was ordered to pay an initial partial filing fee. As he points out in his objections, Plaintiff has been filing the necessary financial affidavits throughout the rest of the proceedings which indicate his account balances are typically a few dollars at most. The Court's accounting records show that it has collected a total of $2.13 from Plaintiff.

Just two weeks after reinstatement of his *in forma pauperis* status in this case, *Brown v. NM District Court, et al.,* CIV 96-968 was again dismissed as frivolous by this Court, and that dismissal was affirmed by the Tenth Circuit on February 18, 1999. The district court-level dismissal became the third strike upon the date of affirmance. *Jennings v. Natrona County Detention Center,* 175 F.3d 775, 779-780 (10th Cir. 1999) (district court dismissal does not count as "prior occasion" until appeal has been waived or exhausted). Consequently, the Tenth Circuit's own decision became his fourth strike. *Id.* at 780.

My previous report recommended that these last two strikes also be applied and that Plaintiff be required to pay the entire filing fee before proceeding. Upon further review, I note that Section 1915(g) is not a jurisdictional limitation and, as illustrated by recent Tenth Circuit decisions, the Court can reach the merits of a decision without excusing a Plaintiff from payment of fees, if it so chooses. *E.g, Garcia v. Silbert,* 141 F.3d 1415, 1417 n.1 (10th Cir. 1998). This case has been pending since 1997 and both Plaintiff and Defendants desire the Court to proceed

to a ruling on the merits. In the interest of moving the matter to a final resolution, therefore, I alternatively address the merits below.[1]

## II. Substantive Analysis

### A. Background

In his verified complaint, Plaintiff's principal claim arises from fights he had with other inmates and a riot that followed that same afternoon on May 10, 1997. Brown asserts that he was the victim in the assaults and seeks to hold Defendants liable on a theory of failure to protect, and alleged violations of procedural due process during the investigation following the riot. Plaintiff is further suing for "unjustified moving me from one institution to another without the Disciplinary hearing Officer approval, for the Chief of Callification (sic) using these dismissed reports to keep me in pre-hearing detention for assault and battery, . . . [and] for lost of property after being moved without approval to Santa Fe, North Unit." *Doc. 1* at 3.

Four defendants remain in their individual capacities.[2] They ask that their Court-ordered *Martinez* report be treated "as a motion for summary judgment." *Doc. 46.* After Plaintiff was served with a copy of the *Martinez* report, he countered with an "affidavit" (which raised new claims), his own set of exhibits, and a Motion to Compel. *Docs 56-57.* His exhibits contain the same materials that Defendants provided with their report, but Plaintiff also provided copies of

---

[1] Addressing the merits does not effect the status of Plaintiff's prior "strikes." Not counting this suit, Plaintiff has filled his quota. If he files another civil rights action, he will not be permitted to proceed *in forma pauperis* and will have to pay the entire filing fee before being allowed to proceed. *E.g., Jennings,* 175 F.3d at 780; *Green v. Nottingham,* 90 F.3d 415 (10th Cir. 1996).

[2] Because Plaintiff seeks damages, the Central New Mexico Corrections Facility was dismissed. *Doc. 20.*

documents relating to his administrative segregation classification.  *See Doc. 56* (separately filed materials).  Defendants responded to these pleadings denying Plaintiff's allegations that they "fabricated" certain documents, arguing that their *Martinez* report exhibits relate to the claims raised in the complaint as ordered, and addressing Plaintiff's new claims.  *Doc. 60.*  Plaintiff then filed a Motion for Appointment of Counsel.  *Doc. 63.*

### B.  Defendants Are Entitled To Summary Judgment on Plaintiff's Failure To Protect Claim

Plaintiff's failure to protect claim encompasses three discrete incidents, the first two of which are discussed in this section.  Plaintiff, who is Black, alleges that at around 1:30 p.m. on May 10, 1997, three unseen Hispanic inmates[3] hit him in the face hard enough to cause his mouth to bleed and knock him out.  Approximately one hour later, two of the same inmates -- Anthony Aragon and Fredrico Gonzales -- returned and started a verbal and physical confrontation with him.  According to Plaintiff's version of the events, Gonzales tried to stab him with a shank and Plaintiff's hand was wounded when he tried to grab it.  Inmate Aragon was then stabbed[4] severely enough to require hospitalization and surgery outside the prison facility.

While the Eighth Amendment imposes a duty on prison official to take reasonable measures to protect prisoners against violence from other prisoners, there is no cause of action if the prison official in question (1) does not know "that inmates face a substantial risk of serious

---

[3]  Plaintiff claims he did not learn of the identity of the assailants until two days later, after the ensuing events were investigated.

[4]  Plaintiff alleges that it was Gonzales who stabbed Aragon.  However, an inmate misconduct report was issued against Plaintiff for stabbing Aragon and his contribution to the riot.  *See Martinez Report,* Exh. D113.  *See Doc. 56,* Exh. D125 (memo explaining that Plaintiff was placed in involuntary administrative segregation because he was implicated by a confidential informant in the Aragon stabbing).

4

harm or (2) does not disregard the known risk by "failing to take reasonable measures to abate it." *See Farmer v. Brennan,* 511 U.S. 825 (1994). Plaintiff must show that each defendant he seeks to hold responsible was personally involved with the conduct of which he complains. It is not sufficient to show that a defendant merely is employed in a supervisory role *vis-a-vis* those who knew of the risk and disregarded it. *See e.g., Grimsley v. MacKay,* 93 F.3d 676 (10th Cir. 1996); *Riddle v. Mondragon,* 83 F.3d 1197 (10th Cir. 1996); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996).

Plaintiff's failure to protect claim based on these incidents fails both prongs of the test. Nowhere in any of his submissions does Plaintiff claim that he was under a specific threat of violence. He does not even allege that he contacted Defendants and made them aware of any concern he may have had for his safety either before the first incident or during the short time that passed between the first and second incidents. Brown does not assert, much less produce any evidence, that any of the named Defendants[5] had any prior knowledge that he would be the subject of an attack.

My independent review of all of the exhibits reveals that there is no material issue of fact in dispute on this point. The only information any correctional officer received specifically about

---

[5] Defendants have never identified their titles or roles. As best I can discern from the materials submitted with the *Martinez* report, Joe Williams was then and is now the Warden of the facility. Captain Kevin R. Wiggins was the shift commander on the day in question. Captain Jose Romero was the correctional officer who investigated the incident in connection with the New Mexico State Police. Edward Chavez, whose title keeps changing with Plaintiff's pleadings, was the head of the committee that makes decisions regarding whether inmates are placed in administrative segregation. *See Complaint* ("for the Chief of Callification (sic) using these dismissed reports to keep me in pre-hearing detention for assault and battery").

Plaintiff occurred *after* both of the incidents.[6] Because the record is simply devoid of any allegation or evidence that any Defendant had reason to know that Plaintiff would assaulted, Defendants are entitled to summary judgment on this claim.

### C. Defendants Are Entitled To Summary Judgment For Defendant Wiggins' Conduct In Handling the Riot

Plaintiff's second altercation gave rise to a riot between Black and Hispanic inmates. Plaintiff complains that Defendant Wiggins handled the situation left him vulnerable to "rocks and things" being thrown by the Hispanic inmates and "in danger" when Black inmates "rushed" a gate. Again, Defendants are entitled to summary judgment on this claim for several reasons.

To find liability under § 1983, the prison official's conduct must rise at least to the level of recklessness or deliberate indifference, both of which involve awareness of a known risk and disregard of it. It has long been held that mere negligence cannot be the basis for § 1983 liability.

---

[6] One week before the incidents, Defendant Romero "received information" that a visitor of Gonzales was going to smuggle in heroin into the prison. He did not learn of Plaintiff's alleged involvement with heroin trafficking within the facility until he interviewed witnesses the day after the riot. *Martinez Report,* Exhs. A55-57 (5/13/97 Report from Romero to Williams). Also, the materials indicate that at 6 a.m. on the day in question one officer suspected something. He told another officer to watch himself because "he heard something was coming down but he didn't know nothing (not audible) it yet. . . . he didn't know but he kind of felt that something was coming down, because of the atmosphere." *Id.,* Exh. E168. Later that day when another officer began his shift just before the riot broke out, he was "advised . . that there may be some trouble." It was not until later that he learned the basis of the warning was that "Inmate Mechionne Cantu #35443 and Frederico Gonzales # 44808 were having some words with Inmate Mark Freeman # 42764, several inmates from both sides (Spanish & black) were grouped up in the same area. . . . they were dispersed and nothing more had occurred." *Id.,* Exh. A35. Only during his investigation after the riot was Defendant Romero made aware by a confidential source that Gonzales, Anthony Aragon and Mechionne Cantu were "engaged in a physical confrantation (sic) with [Plaintiff] in the area of the Central Education Building." *Id.,* Exh. D142. None of these officers who gave each other "warnings" are any of the named defendants, nor are the inmates specifically identified as Plaintiff. Thus, these instances do not give rise to a material issue of fact whether any officer, much less these Defendants, was on notice of potential violence against Plaintiff.

*E.g., Daniels v. Williams,* 474 U.S. 327, 330-31 (1986); *Webber v. Mefford,* 43 F.3d 1340, 1343 (10th Cir. 1994). Moreover, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer,* 511 U.S. at 842-844. Decisions made by prison officials during the course of restoring order during a riot are entitled to a great deal of deference:

> When the "ever-present potential for violent confrontation and conflagration," *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 132 (1977), ripens into actual unrest and conflict, the admonition that "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators," *Rhodes v. Chapman,* [452 U.S. 337, 349, n. 14 (1981)] carries special weight. "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* [441 U.S. 520, 547 (1979)]. That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline. It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.

*Whitley v. Albers,* 475 U.S. 312, 321-22 (1986); *see also e.g., Dunn v. White,* 880 F.2d 1188, 1191 (10th Cir. 1989) ("We are mindful that on issues of internal order and discipline or institutional security, courts should accord wide-ranging deference to prison officials, unless there is substantial evidence in the record to indicate the officials have exaggerated their response" [internal quotations to *Bell* omitted for clarity]), *cert. denied,* 493 U.S. 1059 (1990).

The undisputed facts establish that the fight in which Aragon was stabbed immediately escalated to a confrontation between approximately sixty inmates – Blacks vs. Hispanics. The officers intervened, interjecting themselves between the two warring factions as they attempted to tend to the severely wounded Aragon. The north gate leading into the compound had been

7

secured and locked. Officers moved the two groups away from each other, Blacks on the "north side" and Hispanics on the "south side" of the recreation yard. Black inmates were ordered to leave the yard, but some did not. Defendant Wiggins and other officers in the yard were able to keep the groups separated for only a short period.

Inmate Cantu called on the Hispanic inmates to rally. Wiggins and other officers intervened, positioning themselves between the approaching Hispanic inmates and the Black inmates. The Hispanic inmates began pelting the officers and Black inmates with rocks. The north gates were opened so the officers could leave and as they exited, the remaining Black inmates also "rushed" and ran out gate. *See Martinez Report,* Exhs. A7-A8, A33-A47; *Doc. 56,* ¶¶ 6-16.

I find that there is no basis for finding liability against Defendant Wiggins for his response to the riot. By trying to keep the factions separated and move one group out, while administering medical care and moving the wounded, his actions are eminently reasonable given the circumstances and will not be second-guessed here. There is simply nothing in the record that indicates any bad faith or illegitimate purpose in his actions. To the contrary, Defendant Wiggins subjected himself and other officers at personal risk in an effort to defuse and control a situation described as "pumped" and "tense." *Martinez Report,* Exh. A29. Remarkably, no one else was seriously injured.[7]  Thus, Defendants are entitled to summary judgment on this claim.[8]

---

[7] Plaintiff's claims of injury and delay in medical treatment are conclusory, contradictory and do not support a claim of denial of care for serious medical needs. For example, he claims he was knocked unconscious and suffered a bloody mouth in the first fight, but less than an hour later is back in the recreation yard engaging in a second fight. Plaintiff does not allege and there is nothing in the record that shows he requested medical assistance after the first fight. He claims that he was questioned immediately after the riot instead of receiving medical care. Yet, there is no allegation by Plaintiff or evidence that he requested and was denied medical care for these

8

**D. Defendants Are Entitled To Summary Judgment On Plaintiff's Due Process Claims**

Plaintiff raises five due process claims based on events that transpired immediately after the riot. At the heart of these individual claims is Plaintiff's objection to his transfer and placement in administrative segregation after the riot.[9]

The record reveals that even though no disciplinary hearing was held and state criminal charges were not sought, Plaintiff was transferred to the higher security facility known as "Santa Fe, North Unit." This transfer took place three days after the riot and was based on a inmate Armijo implicating Plaintiff in the stabbing and in heroin trafficking. About two weeks later, on May 27, 1997, Plaintiff was placed on "involuntary segregation status."

In *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court held that an inmate placed in segregation for disciplinary reasons for one month does not "present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest" because conditions in disciplinary segregation "mirrored those conditions imposed upon inmates in administrative segregation and protective custody." *Id.* at 486.

---

injuries. Indeed, one of his own exhibits shows that he was transferred to the infirmary on May 14, 1997 and then to an offsite medical appointment, at which time any medical complaints could have been addressed. *Doc. 56,* Exh. D132. More importantly, however, the record establishes that immediately following the riot, the prison was trying to transport the two seriously injured inmates to the hospital, lock down the prison, and question those involved. I find any delay in medical treatment under those circumstances does not rise to the level of an Eighth Amendment violation. *E.g., Hunt v. Uphoff,* 199 F.3d 1220 (10th Cir. 1999).

[8] Defendant Wiggins is the only Defendant named by Plaintiff in this claim. The record contains no claim or evidence that any other Defendant was involved with the riot control conduct of which Plaintiff complains.

[9] This discussion is based on the prison records he submitted in response to Defendants' *Martinez* report. *See e.g., Doc. 56,* Exhs. D133-D142.

9

Both before and after *Sandin,* the Tenth Circuit has held that placement in administrative segregation and ultimate transfer to a maximum security prison does not give rise to a protected liberty interest.  See *Talley v. Hesse,* 91 F.3d 1411, 1413 (10th Cir. 1996) ("*Sandin* makes clear that placement in administrative segregation such as occurred here does not give rise to a liberty interest."); *Templeman v. Gunter,* 16 F.3d 367, 369 (10th Cir. 1994) ("It is recognized that inmates are not entitled to a particular degree of liberty in prison, and that ordinarily a change in an inmate's prison classification to administrative segregation does not deprive the inmate of liberty.").  On this basis alone, Plaintiff's claim fails.

I recognize that since the *Sandin* decision, there has been some discussion in unpublished opinions of the Tenth Circuit and in other circuits whether the duration and conditions of confinement in administrative segregation are factors to consider in deciding whether a liberty interest is implicated.  See *Chappell v. McKune,* 1997 WL 787184 (10th Cir. 1997) (citing *Clemmons v. Thomas,* 1996 WL 282304 (10th Cir. 1996)); *see also McClary v. Kelly,* 4 F. Supp.2d 195 (W.D.N.Y. 1998).  However, on the basis of the record before me, I find that the concerns raised by those decisions do not apply here.

The record reflects that Plaintiff was afforded a classification review, at the most, within four months of his original classification by the Administrative Segregation Classification Committee, which voted that he be released to the general population.  On November 6, 1997, however, Warden LeMaster overruled the recommendation stating that

> your placement in Administrative Segregation is due to stabbing another inmate at CNMCF on May 10, 1997.  This incident escalated into a large racial disturbance where numerous inmates and Officers were injured.  Information received after the incident indicates the stabbing occurred due to bad drug deals that you were involved in.

10

> The trafficking of drugs within the institution in itself indicates your presence in [the] population jeopardizes the safety of others. Add to this your willingness to resort to violence to further your goals shows a complete disregard for the safety of both staff and other inmates.
>
> Your presence in the general population would present a continued threat to the security of this institution. I have denied the recommendation to release you.

*Doc. 56,* Exh. D137.

Thereafter the record reflects that the prison reviewed his status periodically as required by prison regulations, trying to find a more suitable placement than administrative segregation. Within six months of Warden LeMaster's decision, when Plaintiff had been in Administrative Segregation for one year, there were recommendations to transfer Plaintiff to other facilities.

By the fall of 1998, it was determined that Plaintiff should be transferred to Hobbs, but he refused the transfer. He maintained that he was not involved in the stabbing, that all the charges were dropped, and that the inmates involved in the 1997 altercation were out of prison. He requested placement in the "Western" facility or to stay where he was "North Facility in Administrative Segregation." If he were to be placed out of state he wanted to go to Washington or Minnesota.

By December 1998, because of a "lack of viable alternatives," out-of-state placement in Virginia was recommended. In February 1999, Plaintiff appealed that decision, again insisting that he wanted to go to the Western Facility, stay where he was, or be transferred to Washington or Minnesota. In June, the out-of-state placement was approved and Brown was transferred to Virginia on September 23, 1999. Less than one month later, he was transferred back to New Mexico for "court purposes" and retained his old classification. *Id.*; Exh. D133; *Doc. 48.*

Tenth Circuit decisions have found no liberty interests implicated in cases of administrative

11

segregation for up to fifteen months, *Jones v. Fields,* 1996 WL 731240 (10th Cir. 1996) (unpublished and attached). It is apparent that prison officials took steps to remove Plaintiff from administrative segregation within a year of his being placed there, but that Plaintiff opposed those efforts. *Penrod v. Zavaras,* 94 F.3d 1399, 1406 (10th Cir. 1996) (no due process violation where prisoners would be moved from administrative segregation once they entered a program or found a job, but plaintiff had refused both alternatives). Moreover, Plaintiff has not shown that the administrative segregation was significantly different from the general population. *See id.; see also Chappell v. McKune,* 1999 WL 1079618 (10th Cir. 1999); *Jones v. Baker,* 155 F.3d 810, 812 (6th Cir. 1998) (inmate held in administrative segregation for two and one-half years pending investigation for murder in prison riot was not "atypical").

Having no liberty interest at stake in connection with his transfer and classification, all of Plaintiff's related due process claims[10] fail under *Sandin. See Talley,* 91 F.3d at 1413 (because placement in administrative segregation did not give rise to a liberty interest, procedural due

---

[10] Plaintiff complains of procedures employed during the investigation following the riot which lead to the decision to transfer and classify him in administrative segregation. For example, he alleges that an investigation started immediately following the riot, and that he and other Black inmates were questioned without being advised of their rights. He, of course, cannot raise claims on behalf of others. As to his own claim, I find it without merit in its own right because under federal constitutional standards not all procedural rights apply in the prison context. *Sandin,* 515 U.S. at 484-485. I have found no decisions holding that any process is due to a prisoner who observed a riot during questioning immediately following the riot. Plaintiff did not become a suspect for his alleged involvement in events until the day after the riot. When Plaintiff was interviewed three days after the riot, he was advised of the right to remain silent and to counsel and refused to sign the waiver. *Martinez Report,* Exh. A54.

Plaintiff also argues that pursuant to Corrections Department policy a "misconduct report must be submitted for supervisory review and a copy given to the inmate within 24 hours from the date of the incident." In fact, the two misconduct reports issued against Plaintiff were "dismissed" for this very reason. This claim fails because the underlying liberty interest claim fails. Also for the additional reasons stated above, a violation of state law that is remedied at the state level does not give rise to a constitutional claim.

process claims were also foreclosed); *see also Walling v. Slusher,* 976 F. Supp. 1402 (D. Kan. 1997).

Finally, Plaintiff claims that upon his transfer to the North Unit, certain of his personal property was "lost." The evidence he submitted in opposition to Defendants' motion indicate that the situation was resolved at the prison level after his transfer. Furthermore, even if the seizure of a prisoner's property is improper, an unintentional deprivation of property does not give rise to a Due Process claim if adequate state post-deprivation remedies are available. *E.g, Hudson v. Palmer,* 468 U.S. 517, 533 (1984); *Smith v. Maschner,* 899 F.2d 940, 943 (10th Cir. 1990). As illustrated by his own evidence, Plaintiff had state remedies available to him.

### III. Sanctions Are Not Warranted

Defendants also seek to sanction Plaintiff, arguing that the materials they submitted with the report show the altercations were instigated by Plaintiff and that he was the assailant in the stabbing. They argue sanctions are justified because their materials establish that Plaintiff's factual allegations are untrue and this case "exemplifies the type of frivolous, harassing, vexatious and meritless lawsuit which the Prison Litigation Reform Act intended to curtail." *Doc. 46, pp. 16-17.*

Even if prisoners pay all or most of the filing fee, when they apply to proceed *in forma pauperis*, under 28 U.S.C. § 1915(e)(2) the Court is under a continuing obligation to evaluate whether the complaint is frivolous, malicious, or fails to state a claim. Although the *Martinez* report can be considered in connection with the § 1915 analysis, if I rely on matters outside the pleadings as I have done here, the matter is treated under FED. R. CIV. P. 56 and not under § 1915(e)(2)(B). *See Raymer v. Enright,* 113 F.3d 172, 174 n. 1 (10th Cir.), *cert. denied,* 552 U.S.

872 (1997); *Hall v. Bellmon,* 935 F.2d 1106, 1109 (10th Cir. 1991).

Defendants want the Court determine as a matter of fact that Plaintiff was the assailant. I find, however that this is a disputed fact and its resolution was not necessary to dispose of this matter. I further find that recommending dismissal with prejudice and that Plaintiff's prior four strikes are sufficient to deter any future frivolous filings.

Wherefore,

**IT IS HEREBY RECOMMENDED THAT:**

1. Summary judgment be granted in favor of Defendants, *see Doc. 46;*

2. Plaintiff's complaint be dismissed with prejudice;

3. Plaintiff's Motion to Compel be denied, *Doc.57;* and

4. Plaintiff's Motion for Appointment of Counsel be denied, *Doc. 63.*

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636 (b)(1). **A party must file any objections with the Clerk of the District Court within the ten day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

104 F.3d 367 (Table)
97 CJ C.A.R. 23
**Unpublished Disposition**
**(Cite as: 104 F.3d 367, 1996 WL 731240 (10th Cir.(Okla.)))**
<KeyCite Citations>

NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA10 Rule 36.3 for rules regarding the publication and citation of unpublished opinions.)

Johnny JONES, Plaintiff-Appellant,
v.
Larry A. FIELDS, Dan Reynolds, Ken Klinger, Frank Morgan, John East, Eddie Morgan, Defendants-Appellees.

No. 95-6354.

United States Court of Appeals, Tenth Circuit.

Dec. 20, 1996.

Before PORFILIO, ALARCON, [FN**] and LUCERO, Circuit Judges.

FN** Honorable Arthur L. Alarcon, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

ORDER AND JUDGMENT [FN*]

FN* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

ALARCON, Circuit Judge.

**\*\*1** After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R.App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

Plaintiff filed a civil rights action pursuant to 42 U.S.C. § 1983 alleging that defendants violated his Fourteenth Amendment liberty interests by placing him in administrative segregation. The district court granted defendants' motion for summary judgment. We affirm.

Plaintiff escaped from custody in December 1992 and was apprehended the following day. He was convicted of escape from a penal institution. Also, he received a prison misconduct charge for the escape, which apparently was expunged. After a hearing held in April 1994, the administrative segregation review board recommended that plaintiff be reclassified and placed in administrative segregation primarily based on his escape history and threatening behavior. The warden approved the recommendation.

Thereafter, plaintiff commenced this action alleging that he was entitled to due process before his reclassification to administrative segregation because prison regulations created

15

a liberty interest protected by the Due Process Clause. He also maintained that his liberty interest was violated from the time he was apprehended from his escape until the hearing was held. He apparently equated his placement in high security with administrative segregation. The magistrate judge recommended that summary judgment be granted in favor of defendants, because plaintiff did not have a liberty interest in remaining in the general prison population and the mandatory regulations merely gave plaintiff the right to a hearing which he received and did not create a liberty interest. Also, the magistrate judge determined that even if plaintiff were entitled to a hearing, he received a proper hearing, in compliance with the requirements of Wolff v. McDonnell, 418 U.S. 539 (1974). After de novo review, the district court adopted the magistrate judge's recommendation and granted defendants' motion for summary judgment.

> We review the grant ... of summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed.R.Civ.P. 56(c). Summary judgment is appropriate if ... there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.

Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir.1996)(quotation omitted). Because plaintiff is proceeding pro se, we must construe his pleadings liberally. See Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir.1991).

On appeal, plaintiff argues that there is an issue of fact whether defendants violated his liberty interest by placing him in administrative segregation without due process. He claims the conditions of administrative segregation are atypical to general conditions of confinement, he was subjected to administrative segregation for fifteen months without due process, and prison regulations require a hearing prior to placement in administrative segregation. We agree with the district court's conclusion that plaintiff failed to establish a liberty interest.

**\*\*2** A recent Supreme Court case provides further support for the court's decision. In Sandin v. Conner, 115 S.Ct. 2293, 2300 (1995), [FN1] the Court held that prison regulations do not create liberty interests unless they protect prisoners from restraints imposing "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Such was not the case here. See Talley v. Hesse, 91 F.3d 1411, 1413 (10th Cir.1996)( "[P]lacement in administrative segregation such as occurred here does not give rise to a liberty interest."); see also Orellana v. Kyle, 65 F.3d 29, 32 n. 2 (5th Cir.1995)(unlikely administrative segregation can give rise to constitutional claim after Sandin ), cert. denied, 116 S.Ct. 736 (1996). Administrative segregation due to legitimate concerns about plaintiff's escape history and prison security did not impose an atypical and significant hardship on plaintiff in relation to the ordinary incidents of prison life. See Penrod v. Zavaras, 94 F.3d 1399, 1407 (10th Cir.1996).

> FN1. Sandin is applied retroactively. Talley v. Hesse, 91 F.3d 1411, 1413 (10th Cir.1996).

The judgment of the United States District Court for the Western District of Oklahoma is AFFIRMED. The mandate shall issue forthwith.

END OF DOCUMENT